**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MICHAEL LOMAX,** | |
| **Plaintiff,** | |
| **v.** | **No. 20-cv-55-RC-ZMF** |
| **COMMISSIONER OF SOCIAL SECURITY,** | |
| **Defendant.** | |

**REPORT AND RECOMMENDATION**

Plaintiff Michael Lomax moves for reversal of the Commissioner of Social Security's decision adopting the findings of an Administrative Law Judge ("ALJ") and denying his application for Supplemental Security Income and Social Security Disability Insurance.  *See* ECF No. 18 (Pl.'s Mot. J. Rev.) at 1.  Mr. Lomax claims the ALJ's decision relied on three errors: (1) that the ALJ failed to adequately consider the limitations arising from the side effects of Mr. Lomax's prescription medications, *see* Pl.'s Mot. J. Rev. at 9–12; (2) that in determining the extent of Mr. Lomax's limitations, the ALJ improperly discounted the testimony of Arsiema Yeibio, a community support worker, *see id.* at 12–15; (3) that the hypothetical question the ALJ posed to a vocational expert ("VE") did not account for Mr. Lomax's limitations, and therefore the ALJ's reliance on the VE's testimony was improper, *see id.* at 16–17.  The undersigned recommends this Court grant Mr. Lomax's motion for a judgment of reversal and remand this matter for further proceedings.

I.     **BACKGROUND**

A.     Statutory Framework

The Social Security Administration ("SSA") determines a person is disabled if he is unable "to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

The SSA utilizes a five-step sequential evaluation process for determining whether a claimant is disabled. *See* AR 16; 20 C.F.R. § 404.1520(a). The claimant bears the burden at each of the first four steps. *See Butler v. Barnhart*, 353 F.3d 992, 997 (D.C. Cir. 2004) (citing 20 C.F.R. §§ 404.1520, 416.920). At step one, the claimant must demonstrate he is not presently engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(a). At step two, the claimant must show that he has a "severe" medically determinable impairment that "significantly limits [his] ability to perform basic work activities." *Id.* §§ 404.1520(b), 416.920(b). At step three, the claimant is determined disabled if his impairment meets or equals the criteria of an impairment listed in the SSA Commissioner's regulations. *See id.* §§ 404.1520(c), 416.920(c). If the claimant's impairment does not meet or equal a listed impairment, the ALJ proceeds to step four, at which he determines whether the claimant's residual functional capacity ("RFC") allows for performance of the claimant's past relevant work. *See id.* 404.1520(d)–(f). If not, then at step five, the Commissioner looks to the claimant's RFC, age, and education to determine if he can perform other work in the national economy. *See id.* §§ 404.1520(g)–(h), 404.1560(c).

B.     Factual Background

Mr. Lomax, a 55 year-old man, *see* AR 41, has been limited by bipolar disorder, depression and psychotic symptoms including auditory hallucinations since at least 2015. At an August 12,

2

2015, appointment at Family Matters of Greater Washington, Mr. Lomax reported that he had been previously diagnosed with depression, *see* ECF No. 15 (Administrative Record) at 572,[1] and that he felt sad most days, *see* AR 570.  He also reported that "he hears 'voices' in his head."  AR 572. On March 24, 2016, Mr. Lomax visited the D.C. Dept. of Behavioral Health where Dr. Umar Rahman diagnosed him with bipolar disorder.  *See* AR 670.  At an April 21, 2016, examination, Dr. Rahman found that "bipolar disorder with psychosis" prevented Mr. Lomax from working. AR 684–85.  Drug treatment discharge records from May 26, 2016, indicate Mr. Lomax had continuing problems with schizophrenia, depressive disorder, and mood disorder.  *See* AR 912– 13.

On June 23, 2016, State Agency Psychological Consultant Patricia Cott, Ph.D. evaluated Mr. Lomax's claimed disability due to depression, bipolar disorder, and mood disorder.  *See* AR 87, 92.  After considering his limitations, Dr. Cott found that Mr. Lomax "can understand and remember simple instructions, [and] can carry out tasks for a full standard work week with adequate pace and attention."  AR 95.

At a July 12, 2016, appointment with the D.C. Dept. of Behavioral Health, Mr. Lomax's diagnosis included that his bipolar disorder was "severe with psychotic features."  AR 984.

SSA consultative examiner James Arnold, Ph.D. evaluated Mr. Lomax on February 2, 2017.  *See* AR 1021.  Arnold found that Mr. Lomax's "attention and concentration were impaired," and that he suffered "emotional distress resultant to [his] current psychiatric disorder."  AR 1024– 25.  Dr. Arnold diagnosed Mr. Lomax with polysubstance dependency and major depressive disorder.  *See* AR 1027.

---

[1] The Administrative Record ("AR") is filed on the Court's electronic docket in eleven parts at ECF No. 15-1 through ECF No. 15-12.  For ease of reference, citations to the AR will refer to the page numbers provided in the lower right-hand corner of each page.

State Agency Reviewing Psychologist Gemma Nachbahr, Ph.D., evaluated Mr. Lomax on March 23, 2017, as part of the reconsideration of his disability determination. *See* AR 110. Dr. Nachbahr's findings largely mirrored Dr. Cott's, and she determined that Mr. Lomax had a "moderate" impairment in his ability to understand, remember, or apply information, interact with others, concentrate, persist or maintain pace, as well as in his ability to adapt and manage himself. *See id.* Dr. Nachbahr's finding regarding Mr. Lomax's ability to work was identical to Dr. Cott's. *See* AR 94, 114.

At a February 5, 2018, appointment with Pathways to Housing, Mr. Lomax reported increased depression and that he was hearing non-command auditory hallucinations. *See* AR 1238. At a July 16, 2018, appointment he reported "answering and talking to" "more voices." AR 1234. By a March 22, 2019, appointment Mr. Lomax's depressive symptoms and auditory hallucinations had intensified, making it harder for him to keep himself organized and to stay on task. *See* AR 1305.

At his April 18, 2019, hearing before the ALJ, Mr. Lomax reported that he continued to receive treatment for bipolar disorder, seeing a psychiatrist once a month and visiting a therapist once a month. *See* AR 53. Mr. Lomax reported being sad and depressed "at least four days" per week  and that he continued to hear voices on a "regular basis." AR 61–62.

Mr. Lomax has been prescribed psychiatric medications as a result of his diagnosed disorders. On August 12, 2015, he reported taking Trazadone and Seroquel. *See* AR 570. Mr. Lomax reported being fatigued, and the examining physician noted: "unclear if this is due to the medications, which he reports make him feel very drowsy." AR 570. On March 24, 2016, Dr. Rahman found that Mr. Lomax's depression was somewhat stabilized by his prescriptions for Seroquel, Trazadone, and Prozac. *See* AR 676. Records from Mr. Lomax's February 2017

4

examination by Dr. Arnold indicate that "[h]e appeared to be exhausted" and "[h]is eyelids were drooping throughout the evaluation."  AR 1024.

On March 29, 2017, Mr. Lomax reported that he usually slept eight hours during the night and four hours during the day, and that he had reduced his morning Seroquel dose because it made him "too sleepy."[2]  AR 1262.  Mr. Lomax said he felt calmer when on medication, and that he became "antsy/jittery" when not taking his medication.  *Id.*  By May 3, 2017, Mr. Lomax had stopped using Seroquel because of problems with weight gain but was given an increased dose of Trazodone because of his trouble sleeping.  *See* AR 1256.  In September 2017, Mr. Lomax reported difficulty sleeping and sluggishness during the day, but that his medication was helpful to him overall.  *See* AR 1253.  On November 22, 2017, Mr. Lomax again reported being tired during the day, but the doctor suggested "it likely is because he has been taking the Rexulti during the day rather than at bedtime."  AR 1241.  On July 16, 2018, Mr. Lomax reported increased daytime sedation, but that he could not sleep without taking Trazadone.  *See* AR 1234.  On September 10, 2018, Mr. Lomax reported that he had sometimes limited his medication because of concern over daytime sedation when he needed to make it to appointments.  *See* AR 1231.  He said he was otherwise compliant with his prescriptions, taking Wellbutrin, Topamax, Gabapentin, Abilify, and Trazodone at bedtime.  *See id.*  In December 2018, Mr. Lomax reported to Dr. Alexis Wesley that he was "intermittently compliant with his psychiatric medication due to concern about erectile dysfunction."  *See* AR 1264.  Mr. Lomax said that he would only sleep well while taking Trazodone but also remain fatigued during the day.  *See id.*  Dr. Wesley noted that Mr. Lomax "realized he

---

[2] Mr. Lomax again reported sleeping for eight hours at night and four hours during the daytime on September 10, 2018.  *See* AR 1231.

was still taking Trazadone 300mg qhs despite being switched to Trazadone 150mg qhs" and agreed to try a reduced dose. *See id.*

Mr. Lomax discussed his medications and their effects in detail at his April 18, 2019, hearing. Mr. Lomax could not recall the names of his medications, but said that he became "drowsy, sleepy, and dizzy" when taking them. AR 54–55. Mr. Lomax said that he typically slept for hours during the daytime to cope with his medication-induced drowsiness.[3] *See* AR 62–63. He also said that dizziness arising from his medication often caused things to "spin around," and would last for "[a]t least an hour or two." AR 64.

Mr. Lomax has also struggled with addiction and substance abuse. In August 2015, Mr. Lomax reported using alcohol, PCP, and cocaine for 30 years, with some periods of sobriety. *See* AR 572. The examining physician wrote that "it is difficult to know if the psychotic symptoms are related to the substance use or an actual symptom of a mental health disorder." *Id.* As of December 8, 2015, Mr. Lomax "continue[d] to engage in severe substance use," but "agreed to take himself back to drug treatment." AR 579. From February 26, 2016, to May 26, 2016, Mr. Lomax was in inpatient drug treatment. *See* AR 912. At a July 16, 2018, medical appointment Mr. Lomax "admitted to relapsing on cocaine and PCP around one month ago, 'just once.'" AR 1234. At his April 18, 2019 hearing Mr. Lomax claimed he was two years sober. *See* AR 60.

The record also includes a statement from Arsiema Yeibio, a Licensed Independent Clinical Social Worker. *See* AR 378. Ms. Yeibio began working with Mr. Lomax in March 2017, and had known him for two years. *See id.* Ms. Yeibio said that she "interact[ed] with Mr. Lomax about two or three times a month," helping him in "maintaining his public benefits, addressing his

---

[3] On multiple occasions in his medical records, Mr. Lomax reported sleeping four hours during the daytime. *See e.g.*, AR 1231, 1262.

housing needs, supporting his Activities of Daily living, coordinating medical and psychiatric appointments, and providing support/education around his medical needs and substance abuse recovery." *Id.* Ms. Yeibio noted Mr. Lomax's difficulty with anger and irritability as well as concentration and memory, stating he "would not be able to maintain a regular work schedule . . . without significant accommodations and support." *Id.*

In his disability application, Mr. Lomax said that he had not worked since 2015. *See* AR 331. He reported working as a laborer moving construction debris from 2014–15, as a laborer for a temp agency from 2010–15, and as a grocery clerk from 2009–10 and 1988–99. *See* AR 331–35. His income records and testimony also indicated past work as a dining room attendant and dishwasher. *See* AR 49–51, 268–69.

C.      Procedural Background

Mr. Lomax applied for Social Security Disability Insurance and Supplemental Security Income on May 11 and 12, 2016, respectively. *See* AR 15. Mr. Lomax claimed eligibility under an alleged disability beginning on May 11, 2015. *See id.*; *see also* AR 250. Mr. Lomax listed depression, bipolar disorder, and mood disorder as the conditions limiting his ability to work. *See* AR 280. On June 23, 2016, SSA denied Mr. Lomax's initial application. *See* AR 85. On March 24, 2017, the SSA denied his request for reconsideration. *See* AR 170.

On April 19, 2017, Mr. Lomax filed a request for a hearing before an ALJ. *See* AR 173. Mr. Lomax wrote: "my symptoms are getting worst [sic], I can't function in the community like a normal person and my medication keep [sic] me down all day." AR 174.

On April 18, 2019, Mr. Lomax appeared before ALJ Henry Kramzyk. *See* AR 36. During the hearing, the ALJ and Mr. Lomax's attorney asked Mr. Lomax about his medical condition,

side effects from medication, work history, lifestyle, and drug use. *See* AR 40–65. The ALJ then

asked the VE a hypothetical question to assess Mr. Lomax's ability to find work:

> I want you to assume a hypothetical Claimant of the same age,
> education, and work experience as the Claimant, who has the ability
> to lift, carry, push, pull up to 20 pounds occasionally and ten pounds
> frequently, sit for a total of up to six hours a day, and stand and/or
> walk for a total of up to six hours a day. This hypothetical individual
> can never climb ladders, ropes, or scaffolds, can never crouch,
> kneel, or crawl. This hypothetical individual is able to understand,
> remember, and carry out short, simple, routine instructions. Is able
> to sustain attention and concentration for two-hour periods at a time
> and for eight hours in the workday, on short, simple, routine
> instructions. Can use judgment in making work decisions related to
> short, simple, routine instructions. Requires an occupation with only
> occasional co-worker contact and supervision. Requires an
> occupation with set, routine procedures and instructions and few
> changes during the workday. Requires an occupation where there's
> only occasional contact with the public on routine matters. Can do
> work with below-average work-production pressures and maintain
> regular attendance and be punctual within customary tolerances and
> can perform activities within a schedule. In addition, this
> hypothetical individual cannot do any driving of vehicular
> equipment.

AR 68–69. The VE testified that such an individual could perform Mr. Lomax's past employment

as a dishwasher or dining room attendant, and that he could perform other work as an assembler,

hand packager, or inspector. *See* AR 69. In a second hypothetical, the ALJ asked the VE whether

a similar individual who was absent from work one day a week could find any past or other work.

*See* AR 69–70. The VE testified that such an individual could not. *See* AR 70. On examination

by Mr. Lomax's attorney, the VE testified that an individual in the first hypothetical who needed

to be off task for 15% of the workday, would miss two days of work per month, or would be late

by five minutes two days a month could not find past or other work. *See* AR 70–71.

On May 16, 2019, the ALJ denied Mr. Lomax's claim. *See* AR 29. The ALJ found in Mr.

Lomax's favor at steps one and two. *See* AR 17–18. At step three, the ALJ determined that Mr.

Lomax did not have an impairment that met the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* AR 18.

Having found that Mr. Lomax did not have a severe limitation under step three, the ALJ considered his RFC.  *See* AR 20–27.  The ALJ found that Mr. Lomax *could* perform "light work" with certain physical limitations.  AR 20.  The ALJ also determined that Mr. Lomax was able to "understand, remember, and carry out short, simple routine instructions; sustain attention and concentration for two-hour periods at a time and eight hours during the workday on such instructions; and use judgment in making work decisions related to such instructions," and could "maintain regular attendance, be punctual within customary tolerances, and perform activities within a schedule."  AR 20–21.  In evaluating Mr. Lomax's claims, the ALJ found that Mr. Lomax's "allegations regarding the severity of his symptoms [were] inconsistent with the objective medical evidence of record."  AR 22.  The ALJ determined that some symptoms were likely the result of Mr. Lomax's use of PCP and not his mental disorder.  *See* AR 23–24.  The ALJ found that Mr. Lomax's testimony about his daily life was incompatible with his testimony about the severity of his symptoms.  *See* AR 24.  In considering the psychiatric evidence available, the ALJ gave some weight to reports by Patricia Cott, Ph.D., Gemma Nachbahr, Ph.D., and James Arnold, Ph.D.  *See* AR 25–26.  The ALJ gave little weight to the statement of Dr. Umar Rahman and Arsiema Yeibio.  *See* AR 26.

Based on his determination of Mr. Lomax's RFC and on the VE's testimony, the ALJ found in step four that Mr. Lomax could perform past work as a dishwasher and dining room attendant.  *See* AR 27.  At step five, the ALJ found in the alternative that Mr. Lomax could perform other work including as an assembler, hand packager, and inspector.  *See* AR 28–29.  In light of these

determinations, the ALJ determined that "a finding of 'not disabled' [was] therefore appropriate." AR 29.

On June 12, 2019, Mr. Lomax filed a request for review by the SSA Appeals Council.  *See* AR 247–49.  The Council denied review on November 7, 2019.  *See* AR 1.

On January 9, 2020, Mr. Lomax filed a civil complaint seeking review of the SSA's determination that he was not disabled.  *See* ECF No. 1 (Compl.) at 1.  The Commissioner filed an answer on April 28, 2020.  *See* ECF No. 14 (Answer) at 1.  On April 30, 2020, United States District Judge Rudolph Contreras assigned this case to a Magistrate Judge for full case management.  *See* ECF No. 17 (Ord. Referring Case to U.S. Mag. Judge for Full Case Mgmt.). Pending now are Mr. Lomax's Motion for Judgement of Reversal and the Commissioner's Motion for a Judgment of Affirmance.  *See* Pl's Mot. J. Rev.; ECF No. 19 (Def.'s Mot. J. Affirmance).

## II.  <u>LEGAL STANDARD</u>

A district court sits in what is essentially an appellate role when it reviews the Commissioner's disability determination, which must stand "if it is based on substantial evidence in the record and correctly applies the relevant legal standards."  *Butler*, 353 F.3d at 999.  The plaintiff bears the burden of showing that the decision was not supported by substantial evidence, or tainted by legal error.  *See Lane-Rauth v. Barnhart*, 437 F. Supp. 2d 63, 64 (D.D.C. 2006).

In reviewing the ALJ's factual findings, a court does not "determine [for itself] whether [claimant] is disabled."  *Butler*, 353 F.3d at 999.  "[S]ubstantial-evidence review is highly deferential to the agency fact-finder."  *Mitchell-Jenkins v. Colvin*, 86 F. Supp. 3d 5, 9 (D.D.C. 2015) (quoting *Rossello ex. Rel. Rossello v. Astrue*, 529 F.3d 1181, 1185 (D.C. Cir. 2008)).  It requires only that the decision was based on evidence "a reasonable mind might accept as adequate to support a conclusion."  *Butler*, 353 F.3d at 999 (quoting *Richardson v. Perales*, 402 U.S. 389,

401 (1971)).  Particular deference is due to the ALJ's credibility determinations and the weight given to the evidence.  *See Goodman v. Colvin,* 233 F. Supp. 3d 88, 104 (D.D.C. 2017) (quoting *Crosson v. Shalala*, 907 F. Supp 1, 3 (D.D.C. 1995)) ("The reviewing court may neither reweigh the evidence presented to it nor replace the Commissioner's judgment 'concerning the credibility of the evidence with its own.'").  But this deference requires that the ALJ build a "logical bridge" between the evidence and his conclusions so that this Court may "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review."  *Lane-Rauth*, 437 F. Supp. 2d at 67 (quoting *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)).

If the ALJ is found to have applied the correct legal standards and met the substantial evidence threshold, the reviewing court may grant the Commissioner's motion for an affirmance of the disability determination.  *See, e.g., Hicks v. Astrue*, 718 F. Supp. 2d 1, 17 (D.D.C. 2010).  If a court finds error in an ALJ's determination that a claimant was not disabled, it may reverse and remand, requiring the SSA to conduct further proceedings consistent with the law or to hold a new hearing.  *See, e.g.*, *Jackson v. Barnhart*, 271 F. Supp. 2d. 30, 38 (D.D.C. 2002); *Simms v. Sullivan*, 877 F.2d 1047, 1053 (D.C. Cir. 1989).  An error is harmless and does not require reversal when it is "clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination."  *Davis v. Berryhill*, 272 F. Supp. 3d 154, 180 (D.D.C. 2017) (quoting *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008)) (internal quotation marks omitted).  If the factual record is fully developed and the court determines the proper legal standard *requires* a finding of disability, it may remand with an instruction to award benefits.  *See, e.g.*, *Martin v. Apfel*, 118 F. Supp. 2d 9, 18–19 (D.D.C. 2000).

III.   **ANALYSIS**

A.   <u>The ALJ's Consideration of Mr. Lomax's Medication Side Effects</u>

1.   *Legal Standard*

The SSA "*will consider* . . . how [claimant's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, *medication*, and other treatment." 20 C.F.R. § 404.1520a(c)(1) (emphasis added).  Consideration of the "side effects of medication" applies to *both* the assessment of functional limitation *and* the "RFC assessment." *See id*. at 404.1520a(c); SSR 96-8P, 1996 SSR LEXIS 5.

A reviewing court must examine whether the ALJ "has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits."  *Simms*, 877 F.2d at 1050 (quoting *Stewart v. Sec'y of HEW*, 714 F.2d 287, 290 (3d Cir. 1983)).  The ALJ "must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." *Lane-Rauth*, 437 F. Supp. 2d at 67 (quoting *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000)). When medication side effects are "squarely placed before" an ALJ, the record should reflect "which side effects he considered, to what extent he considered them, or how he considered them." *Flores v. Massanari*, 19 Fed. App'x 393, 399–400 (7th Cir. 2001).  An ALJ's failure to consider relevant side effects, including fatigue, requires remand.  *See, e.g.*, *Martin*, 118 F. Supp. 2d at 18– 19.

2.   *Analysis*

a.   The Step Three Analysis

A claimant can qualify under listing 12.04 (depressive, bipolar, or related disorders) if he has an "extreme limitation of one, or marked limitation of two, of the following areas of mental functioning.   1. Understand, remember, or apply information.   2. Interact with others.

3. Concentrate, persist, or maintain pace.  4. Adapt or manage oneself."  20 C.F.R. Part 404, Subpart P, Appendix 1 (citations omitted).

The ALJ found that Mr. Lomax had did not have any marked or extreme limitations, but faced only moderate limitations in each of the four areas of functioning.  *See* AR 19–20.  Yet, the ALJ's *only* mention of Mr. Lomax's medications was the note that "the claimant admitted his medication was helping with social interactions."  AR 19.   The SSA claims, nevertheless, that because the ALJ afforded the opinion of Ms. Yeibio little weight and attributed the side effects to factors other than Mr. Lomax's medication, the ALJ provided substantial evidence for his findings in step three.  *See* Def's Mot. J. Affirmance at 18.  But the record provides no support for the proposition that the "ALJ correctly explained that [Mr. Lomax's] side effects were not primarily attributed to [his] proper use of medication."  *Id.* (citing AR 19, 21, 24).  The following citations fail to support the SSA's claim:

- AR 19 can only be interpreted to refer to the brief mention of the beneficial effect of medication in the step three analysis.  But the regulations require the *separate* consideration of a medication's effectiveness and its side effects.  *See* 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv)).

- AR 21 only looks to the intended effects, as the ALJ noted that that Mr. Lomax "had not experienced significant problems interacting with others since he had been placed on medication."

- AR 24 reflects that the ALJ noted that Mr. Lomax's "current medication regime has been successful in managing his mental health symptoms."

When a claimant directly testifies regarding the impact of medication side effects on his ability to work, "an ALJ's duty to develop a full record can include investigating the side effects."

*Walker v. Comm'r of Soc. Sec.*, 404 Fed. App'x 362, 366 (11th Cir. 2010).  This court has held that an ALJ committed an "obvious violation of his obligation" when he failed to consider a claimant's uncontradicted testimony that her medication made "her sleep for three hours each day." *Martin*, 118 F. Supp. 2d at 15–16.  Similarly, the ALJ's decision here did not address the impact of Mr. Lomax's side effects, and therefore failed to consider the "cumulative effects" of his treatment and underlying condition.  *Id.*

Mr. Lomax's claimed side effects were relevant to the ALJ's finding of a moderate limitation in "concentrating, persisting, or maintaining pace."  Examples of this limitation include a claimant's ability to "[sustain] an ordinary routine and regular attendance at work; and [work] a full day without needing more than the allotted number or length of rest periods during the day." 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00E3.  In uncontradicted testimony, Mr. Lomax said that his medications induced drowsiness that caused him to sleep for hours during the day.  *See* AR 62–63.  Mr. Lomax also testified to dizziness from his medications that required him to rest or lie down for "at least an hour or two."  *See* AR 64.  The ALJ's failure to address these claims with respect to the limitation in concentrating, persisting, and maintaining pace was not "inconsequential" to the disability determination and cannot be construed as harmless error.[4] *Davis*, 272 F. Supp. 3d at 180.  "This failure on the part of the ALJ constitutes an obvious violation

---

[4] Mr. Lomax also argues that the finding of a moderate limitation in "interacting with others" was impacted by the ALJ's failure to properly consider medication side effects.  *See* Pl's Mot. J. Rev. at 11. Mr. Lomax claimed "a detrimental shift in his mood" when he avoided taking medications to attend morning appointments.  *Id.* (citing AR 1231).  Mr. Lomax argues that this evidence was relevant to his ability to keep "social interactions free of excessive irritability."  *Id.* (citing 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00E2).  The ALJ's failure to consider Mr. Lomax's side effects with respect to this limitation was harmless.  Mr. Lomax did not raise the issue of self–adjusting his medication in his testimony or in his application for a hearing.  *See* AR 38–65, 174. And Mr. Lomax has not argued why his changes in mood when *not* medicating should be construed as an effect of his medication under 20 C.F.R. § 404.1520a.

of his obligation to view [Lomax's] situation . . . by understanding the interrelated consequences to [him] of [his] physical and psychological problems and of the medication [he] had to take to secure relief from them." *Martin*, 118 F. Supp. 2d at 16.

                b.        The RFC Analysis

The ALJ was required by law to consider Mr. Lomax's side effects when determining his RFC.  20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv); SSR 16–13p, 2016 SSR LEXIS 4.  Mr. Lomax argues that the ALJ also inadequately considered medication side effects in the RFC assessment, which constituted harmful legal error because it undermined the hypothetical posed to the VE.  *See* Pl's Mot. J. Rev. at 11–12.  Thus, the question is again *whether* the ALJ considered the evidence of Mr. Lomax's side effects in arriving at his findings.

The SSA argues that Mr. Lomax's drowsiness may have been the result not of his medication but of taking more Trazadone than he was prescribed, *see* AR 1264, self-adjusting Trazadone to avoid drowsiness, *see* AR 1256, 1241, 1238, 1234, and his history of drug abuse, AR 578–79.  *See* Def's Mot. J. Affirmance at 16-17.  But the grounds proffered in the RFC analysis are sparse with respect to medication side effects.  The ALJ's first mention of side effects is in his summary of Mr. Lomax's testimony, noting that "[Mr. Lomax] reported side effects associated with his prescribed medications including dizziness, drowsiness, and sleepiness."   AR 21. Medications are only addressed again with reference to impact on Mr. Lomax's symptoms:

- The ALJ determined that "further mental limitations" beyond those found in the RFC assessment were "not justified" because the "increase in medication has been successful in managing his mental health symptoms," AR 23–24; and

- The ALJ described Mr. Lomax's documented history of substance abuse and his recent arrests in detail, noting that a finding of disability is not warranted if a claimant remains unemployed because of these factors. *See* AR 24.

This record does not support the contention that the ALJ actually considered Mr. Lomax's claimed side effects in determining his RFC for four main reasons. Def's Mot. J. Affirmance at 17. *First*, whereas at the outset of his analysis the ALJ mentioned Mr. Lomax's "symptoms" and "side effects" as separate elements of his claim, AR 21, the substantive discussion *only* mentions "symptoms," AR 23–25. *Second*, regardless of whether the evidence of medication self-adjustment and dosage referenced *could possibly* support the ALJ's findings, this reasoning is nowhere to be found in the opinion itself. *See id.* The Court "may only consider the grounds proffered by the agency in its decision, as *post hoc* rationalizations will not suffice." *Clark v. Astrue*, 826 F. Supp. 2d 13, 20 (citing *Butler*, 353 F.3d at 1003 n.5). *Third*, while the ALJ briefly discussed incarceration and substance abuse, he made no mention of their possible relation to Mr. Lomax's claimed side effects. AR 24. The ALJ, not the SSA in subsequent litigation, must build the "logical bridge" between evidence and conclusions. *See Lane-Rauth*, 437 F. Supp. 2d at 67 (quoting *Scott*, 297 F.3d at 595). *Fourth*, the ALJ's consideration of the positive effects of the medication is not a substitute for side effects analysis. The regulations explicitly distinguish between the "effectiveness" and "side effects" of medication. 20 C.F.R. §§ 404.1529(c)(3)(iv). The ALJ's conclusion that the medication "has been successful in managing [Mr. Lomax's] mental health symptoms" can only fairly be construed as considering the former. *See* AR 24.

c.     Remand to the ALJ for Consideration of Side Effects

An ALJ has wide latitude in weighing the relevant evidence and reaching a determination at each stage of the disability analysis. *See Mitchell-Jenkins*, 86 F. Supp. 3d. at 9. The ALJ had

an extensive factual record upon which he might have relied in considering the credibility and impact of Mr. Lomax's claimed side effects. Perhaps the ALJ privately decided that Mr. Lomax's testimony regarding his side effects was not credible. But this Court lacks the powers of Professor Charles Xavier to know. *See* X-MEN FIRST CLASS (Marvel Entertainment, 2011). The law requires that the ALJ make clear his reasoning so that a reviewing court can "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Lane-Rauth*, 437 F Supp. 2d at 64. The ALJ has not done so here.

Mr. Lomax's claimed side effects were the basis for his request for a hearing before the ALJ, *see* AR 173, and were thoroughly discussed during his testimony, *see supra* § I(B). The ALJ's failure to weigh the "obviously probative" evidence of Mr. Lomax's side effects, *see Simms*, 877 F.2d at 1050, renders the disability determination unreliable at steps three, four, and five. Because the ALJ's mistake here left the factual record less than fully developed, reversal with an instruction to award benefits would be inappropriate. *Cf. Martin*, 118 F. Supp. 2d at 18. Rather, the SSA's decision should be reversed and remanded with instructions to properly consider Mr. Lomax's detailed testimony and the extensive evidence in the record reflecting his medication side effects, both at step three of the disability determination and in the RFC assessment. The ALJ may reach the same conclusion as before, but must explain the assessment of all relevant evidence in doing so.

B.     The Low Weight Given to Yeibio's Opinion

"Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s)."[5] 20 C.F.R. § 404.1527(a)(1).

---

[5] 20 C.F.R. §§ 404.1527 and 416.927 detail the criteria an ALJ must follow when weighing medical opinions involving a disability claim filed before March 27, 2017.

Medical opinions are given weight based on: (1) the source's examining relationship with the claimant; (2) the source's treatment relationship with the claimant; (3) the evidence provided to support a source's opinion; (4) the source's opinion's consistency with the record; (5) the source's specialization; and (6) other factors. *See id.* at 404.1527(c)(1)–(6). The ALJ may also consider information from "other sources," such as social workers, if it provides "insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2016 SSR LEXIS 5. The ALJ should generally consider these opinions using the same six factors used in weighing medical opinions. *See* 20 C.F.R. § 404.1527(f)(1). An ALJ may, however, give a non-medical source's opinion less weight because acceptable medical sources are "the most qualified health care professionals." SSR 06-03p, 2006 SSR LEXIS 5 (citing 65 FR 34955 (June 1, 2000)).

An ALJ's discretion is at its apex when weighing evidence and testimony. *See Crosson*, 907 F. Supp at 3. The reviewing court may not "replace the [Commissioner's] judgment 'concerning the credibility of the evidence with its own.'" *Crosson*, 907 F. Supp. at 3. It must instead simply determine whether the ALJ has "sufficiently explained the weight he has given to obviously probative exhibits." *Simms*, 877 F.2d at 1050 (quoting *Stewart*, 714 F.2d at 290). This burden is met if the decision was based on evidence a "reasonable mind" might find adequate, *Butler*, 353 F.3d at 999 (quoting *Richardson*, 402 U.S. at 401), and the ALJ formed a "logical bridge" between that evidence and his conclusions, *Lane-Rauth*, 437 F. Supp. 2d at 67 (quoting *Scott*, 297 F.3d at 595).

Ms. Yeibio opined that Mr. Lomax "would not be able to maintain regular work schedule without accommodation and support." AR 26. In assessing this testimony, the ALJ wrote: "Little weight is given to Ms. Yeibio because she is not an acceptable medical source. In addition, the

claimant acknowledged in his testimony that he could concentrate and focus on tasks such as utilizing public transportation, reading the Bible, using a computer, and using his smartphone." *Id.* Mr. Lomax incorrectly contends that the ALJ was required to give Ms. Yeibio's opinion significant weight because of her close treatment relationship to Mr. Lomax. *See* Pl's Mot. J. Rev. at 13.

First, Mr. Lomax argues that giving Ms. Yeibio's opinion "'little weight . . . as she is not an acceptable medical source' . . . violated the standard set out in SSR 06-03p." Pl's Mot. J. Rev. at 13 (quoting AR 26). To the contrary, the ruling explicitly allows the ALJ to give these sources less weight. *See* SSR 06-03p, 2006 SSR LEXIS 5. "The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source.'" *Id.* It was thus within the ALJ's discretion to rely more heavily on medical opinions as opposed to Ms. Yeibio.

The analysis could have stopped there; however, the ALJ further explained the evidentiary considerations informing his decision. *See Simms*, 877 F.2d at 1050. The ALJ found that Mr. Lomax's testimony regarding his ability to engage in daily activities as well as the beneficial effects of his medication were inconsistent with her statement. *See* AR 26. "Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion," and vice versa. 20 C.F.R. 404.1527(c)(4). The ALJ gave greater weight to the opinions of examiners Dr. Cott and Dr. Nachbahr, which were more consistent with the record. *See* AR 25. Both determined Mr. Lomax could work. *See id.* The ALJ adequately articulated "judgment concerning the credibility of [this] evidence." *Crosson*, 907 F. Supp at 3.

C.     Adequacy of the ALJ's Hypothetical Question

The SSA may use vocational experts in step four "to obtain evidence . . . to help [the SSA] determine whether [claimant] can do [his] past relevant work, given [his RFC]."  20 C.F.R. § 404.1560(b)(2).  This SSA may also use this evidence at step five to determine whether a claimant is able to obtain other work.  20 C.F.R. § 404.1560(c)(1).  "In determining a claimant's ability to work, the ALJ 'must accurately describe the claimant's . . . impairments in any question posed to the expert.'"  *Williams v. Shalala*, 997 F.2d 1494, 1499 (D.C. Cir. 1993) (citing *Simms*, 877 F.2d at 1050).  A hypothetical question must "encompass all relevant impairments."  *Lockard v. Apfel*, 175 F. Supp. 2d 28, 31 (D.D.C. 2001) (quoting *Hunt v. Masanari*, 250 F.3d 622, 626 (8th Cir. 2001)).  The failure of a hypothetical to include *relevant* limitations "undermine[s] the foundation for the expert's ultimate conclusion that there are alternative jobs" and requires remand to the SSA.  *See Butler*, 353 F.3d at 1006 (quoting *Simms*, 877 F.2d at 1053).

Mr. Lomax claims that the hypothetical question[6] did not reflect the ALJ's step three "finding that Mr. Lomax has at least moderate limitations in the [sic] concentration, persistence and pace."  Pl's Mot. J. Rev. at 17 (citing AR 20).[7]

_____

[6] The hypothetical question, in relevant part, asked the VE to consider an individual who: "Is able to sustain attention and concentration for two-hour periods at a time and for eight hours in the workday, on short, simple, routine instructions. Can use judgment in making work decisions related to short, simple, routine instructions. Requires an occupation with only occasional co-worker contact and supervision. Requires an occupation with set, routine procedures and instructions and few changes during the workday. Requires an occupation where there's only occasional contact with the public on routine matters. Can do work with below-average work-production pressures and maintain regular attendance and be punctual within customary tolerances and can perform activities within a schedule."  AR 68-69.

[7] It is important to disentangle this from Mr. Lomax's first claim, in which he alleges proper consideration of the evidence should have resulted in the ALJ finding a more-than-moderate limitation in this domain. *See* Pl.'s Mot. J. Rev. at 11; *supra* § III(A)(2)(a). Here the claim is that the hypothetical failed to reflect even the ALJ's *own* determinations regarding Mr. Lomax's impairment.

This Court recently addressed the question of "whether the hypothetical limiting a claimant's work to simple, routine, repetitive and unskilled tasks adequately accounts for a claimant's moderate limitations in concentration, persistence, or pace." *Petty v. Colvin*, 204 F. Supp. 3d 196, 204 (D.D.C. 2016). The court in *Petty* found the instruction was inadequate because it failed to distinguish between a plaintiff's ability to *complete certain work tasks* and his ability to *stay on task*, a concern more closely related to concentration, persistence, and pace. *See id.* (citing *Mascio v. Astrue*, 780 F.3d 632, 638 (4th Cir. 2015) ("[T]he ability to perform simple tasks differs from the ability to stay on task.")). The Court remanded for the ALJ to either "explain why Plaintiff's moderate limitations in concentration, persistence, or pace at step three do not translate into a limitation in Plaintiff's [RFC]" or "explicitly or implicitly incorporate Plaintiff's moderate mental limitations and any potential affect they have on Plaintiff's ability to complete simple, routine, repetitive and unskilled tasks for sustained periods of time." *Id.* at 208.

*Petty*, therefore, does not stand for the proposition that finding such a moderate limitation *requires* a more limited hypothetical than the one used by the ALJ. Pl's Mot. J. Rev. at 17. Rather, the door remains open for the ALJ to "provide an explanation for why Plaintiff's mental limitations at step three did not translate into more detailed limitations in his RFC." *Petty*, 204 F. Supp 3d at 204. The nature of the explanation required is not discussed in *Petty*, *see id.*, but several circuits that have considered this question have held that an ALJ's failure to include the restrictions Mr. Lomax contends were necessary may be justified. "[W]hen medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011). Moreover, the "ALJ is required only to incorporate into his

hypotheticals those impairments and limitations that he accepts as credible." *Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007); *see also Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1173–74 (9th Cir. 2008) (holding that a hypothetical was appropriate if it reflected the ALJ's credibility determinations and assessment of the medical evidence).  And while the D.C. Circuit has not addressed this exact question, it has held that while an ALJ "must accurately describe the claimant's . . . impairments in any question posed to the expert," *Simms*, 877 F.2d at 1050, the ALJ has considerable latitude in reaching those factual determinations.  Such determinations remain subject to the "highly deferential" substantial evidence review.  *Rossello*, 529 F.3d. at 1185.

Here, the hypothetical question was appropriately explained by the ALJ's credibility determinations *and* assessment of the medical evidence.  The ALJ's finding of a moderate limitation in concentration, persistence, and pace was based on the *type* of tasks he determined Mr. Lomax could complete, not his *ability to stay* on task.  *See* AR 20.  The ALJ found that Mr. Lomax was "capable of short, simple, and routine tasks and work that has a below average production pace rate" based on his ability to complete household chores and to complete a "counting task" during consultative examination.  *Id.*  The RFC assessment followed a similar and consistent logic. *See* AR 25.  The ALJ again considered Mr. Lomax's performance in the consultative examination, then noted the testimony (not discussed in the step three determination) from Dr. Cott and Dr. Nachbahr finding that Mr. Lomax could "carry out tasks for a full standard work week with adequate pace and attention [and] accept supervision for simple tasks."  *Id.*

Thus, while the ALJ never directly addressed "why Plaintiff's mental limitations at step three did not translate into more detailed limitations in his RFC," *Petty*, 204 F. Supp 3d at 204, the lack of further limitations in the hypothetical is explained by his stated grounds for the finding of a "moderate" limitation in concentration, persistence, and pace and the additional findings laid out

in the RFC assessment.  *See* AR 20, 25.  The evidentiary basis for the hypothetical is coherent to a "reasonable mind," *Butler*, 353 F.3d at 999 (quoting *Richardson*, 402 U.S. at 401), and the ALJ's analysis provides enough of a "logical bridge" between his factual findings and the hypothetical to withstand substantial evidence review,  *Lane-Rauth*, 437 F. Supp. 2d at 67 (quoting *Scott*, 297 F.3d at 595).

This holding relates only to the adequacy of the hypothetical with respect to the ALJ's actual findings.  It does not mean that the same hypothetical will necessarily suffice upon adequate consideration of Mr. Lomax's medication side effects.[8]  *See supra* § III(A)(2)(b).

## IV.   RECOMMENDATION

For the forgoing reasons, the undersigned recommends that the Court GRANT Plaintiff's Motion for a Judgement of Reversal only on the ground that the SSA failed to adequately consider Mr. Lomax's medication side effects, DENY Defendant's Motion for a Judgement of Affirmance, and REMAND this matter to the SSA for reconsideration of the step three analysis and Mr. Lomax's RFC in light of his claimed medication side effects.

## V.   REVIEW BY THE DISTRICT COURT

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to this Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis

---

[8] Depending on the nature of any additional limitations, the SSA could rely on the VE's already-established testimony that the hypothetical individual could not find past or other work if he needed to be off task for 15% of the workday, would miss two days of work per month, or would be late by five minutes two days a month.  *See* AR 70–71.

for such objections.  The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation.  *See Thomas v. Arn*, 474 U.S. 140, 144–45 (1985).

Dated: August 4, 2021

_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE